# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| K7 DESIGN GROUP, INC., | ) | Case No. |
| | ) | |
| Plaintiff, | ) | Judge: |
| | ) | |
| v. | ) | |
| | ) | COMPLAINT |
| THE KROGER CO., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, K7 Design Group, Inc. ("K7" and "Plaintiff"), by and through its attorneys, brings this Complaint against The Kroger Co. ("Kroger" and "Defendant"), and alleges and states as follows:

Introduction and Nature of the Action

1. This action arises from an enormous miscalculation by the defendant, Kroger, the nation's largest grocery chain, which grossly over-ordered over $100 million worth of hand sanitizer in the midst of a worldwide pandemic from the plaintiff, K7, a family-owned business. Kroger made its huge orders to take advantage of a worldwide spike in demand for hand sanitizer and similar products. But Kroger ordered too much – way too much. The reason was simple – Kroger and other retailers all made massive orders; as a result, the supply of hand sanitizer and similar products grew rapidly and tremendously. Demand did not keep pace. Rather than accept responsibility for its misjudgment, Kroger has tried to shift it to (at least) one of its suppliers – K7.

2. Once Kroger realized it had over-ordered and did not even have adequate storage space to accept what it had ordered, Kroger refused to pay for or to accept delivery of the vast majority of the hand sanitizer that K7 had manufactured specifically for Kroger.

3. Because Kroger reneged, K7 has been left with a huge quantity of hand sanitizer for which K7 has no other use. And, after it had refused to take delivery, Kroger tried to use its immense market power to force K7 to absorb losses that, both in equity and because of K7's and Kroger's contract, should be borne by Kroger.

4. In late 2019 and early 2020, the Novel Coronavirus (COVID-19) quickly spread around the globe, ravaged millions, and imposed enormous demands on health systems. COVID-19 led people to take extraordinary precautions to avoid infection and spread.

5. Before the COVID-19 pandemic, hand sanitizer, a common consumer product, was plentiful in retail establishments and widely available for purchase. Supply and demand were in sync. With the onset of the pandemic, public health authorities advised people to avoid contracting the virus, believed to spread both through airborne transmission and through contact with commonly used surfaces (like gas pump handles and elevator buttons), by frequently washing or sanitizing their hands (among other precautions). Hand sanitizer quickly flew off of store shelves and became largely unavailable by the spring of 2020. Supply and demand were suddenly very much out of sync. See, e.g., Julie Creswell, "Where Do I find Your Hand Sanitizer?" Sorry, We Have None., N.Y. Times (Feb. 29, 2020), https://nyti.ms/2TDcqjp.

6. Against this backdrop, defendant Kroger, the largest grocery chain in the United States, with more than 2,700 grocery retail stores operating under a variety of banner names, moved quickly to fill their customers' and other consumers' dire need for hand sanitizer and related products. To capture supply, Kroger placed orders with a wide array of suppliers and manufacturers.

7. Kroger asked K7, a previously approved Kroger vendor, among other suppliers, to produce large quantities of hand sanitizer and anti-bacterial soap for Kroger so that Kroger could provide them to its customers throughout the United States.

8. K7 is a New York-based, family-owned manufacturer and distributor of consumer products sold under the "Ultra Defense" brand label. K7 is managed by Michael Kaplan and his four sons. K7 has spent three decades in the health and wellness space, producing private-label and branded products, in both food and drug, for many of the nation's largest retailers, including Kroger, as well as for warehouse clubs and smaller local establishments. By March 2020, K7 had begun producing hand sanitizer and related sanitizing products.

9. K7 had previously sold cosmetics to Kroger in or around 2017 in a deal that representatives from K7 struck after meeting representatives from Kroger at an industry trade show. The transaction was successful for both parties and was completed without a hitch.

10. As described below, in the spring of 2020, Kroger committed to purchase more hand sanitizer and related anti-bacterial products than it could store and warehouse and then proceeded to shift to K7 the economic burdens that flowed from Kroger's misjudgment of its ability to absorb the goods it ordered into either Kroger's storage facilities or its supply chain.

11. As a result, Kroger breached and repudiated its purchase commitment, leaving K7 with approximately $85,000,000 worth of hand sanitizer and anti-bacterial soap that Kroger has refused to accept and for which it has refused to pay. Kroger's breach seriously jeopardizes the continued viability of K7's business.

12. In addition to damages K7 has suffered because of Kroger's refusal to pay for the goods it ordered from K7, K7 has incurred hundreds of thousands of dollars of storage fees for the product that it manufactured specifically to fulfill Kroger's order. K7 has put Kroger on notice on multiple occasions that its refusal to take delivery of the hand sanitizer and related products was adding to K7's losses. Nevertheless, Kroger has continued unjustifiably to refuse to take delivery of its product by withholding delivery instructions. In so doing, Kroger has breached and repudiated its contractual commitment to accept and pay for the specially manufactured goods.

### Jurisdiction and Venue[1]

13. The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(1).

14. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), as defendant Kroger resides in this district.

---

[1] K7 and Kroger entered into two Standard Vendor Agreements (the "Agreements") – one in 2017 and one in 2020. Kroger claims that the 2020 Agreement requires that K7's claim must be resolved by arbitration. K7 believes that this Court is an appropriate forum to resolve this dispute regardless of the Agreements. In addition, if those Agreements are determined to govern this dispute, the plain language of those Agreements, when read together, permits K7 to bring an action in the Federal District Court in Cincinnati for any claim greater than $5 million. The damages and therefore the claim in this case far exceed that threshold.

The Parties

15. K7 ("Plaintiff") is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.

16. Kroger ("Defendant") is a corporation organized under the laws of Ohio with its principal place of business in Cincinnati, Ohio.

COUNT I
(Breach of Contract)

17. Since late 2017, when it supplied cosmetics to Kroger, K7 has been an approved vendor of Kroger.

18. In early March 2020, Kroger started rationing hand sanitizer because their supply of this critical product could not keep up with the exploding demand due to COVID-19.  See John Matarese, Kroger Puts Limits on Sanitizer and Wipe Purchases: Pharmacists Beg People to Stop Hoarding, ABC Cincinnati (Mar. 3, 2020), https://tinyurl.com/y5ys6u8a.  Soon after, Kroger CEO Rodney McMullen addressed the shortage of hand sanitizer and other similar products by posting a video on Kroger's social media that assured shoppers Kroger was working hard to get "the supplies and products [their] customers need[ed] most," that the store's supply chain was working "tirelessly around the clock" to replenish critical supplies, and that shoppers could "purchase what [they] need[ed] knowing [Kroger would] continue to replenish" these supplies.  @krogerco, Instagram (Mar. 17, 2020), https://www.instagram.com/p/B911-hjnriK/.  However, Kroger was still running short on hand sanitizer a month later when McMullen appeared on Good Morning America and reported: "I was in the store last night — we had toilet paper, plenty of meat variety products: beef, pork, chicken, all those things . . . .  As for hand

sanitizer, I think it is going to take a little bit longer." Stephanie Wash et al., Grocery Stores See Food Supplies Stabilizing, but Don't Expect Hand Sanitizer Anytime Soon, ABC News (Apr. 22, 2020), https://tinyurl.com/y55vchg2.

19. In late March 2020, in response to the global COVID-19 pandemic, K7 offered to sell a large quantity of hand sanitizer to Kroger on an expedited basis. The two companies struck a deal for the sale of several million units of hand sanitizer, to be shipped as quickly as possible. This production run and ensuing shipment essentially concluded in June 2020 without complaint from Kroger.

*The May 2020 Contract*

20. In an exchange of emails between Kroger and K7, between approximately May 5, 2020, and May 13, 2020, K7 and Kroger discussed a second "replenishment" production run of hand sanitizer and anti-bacterial soap that K7 would manufacture and sell to Kroger by making deliveries, according to a prescribed schedule running from mid-July, 2020, to January, 2021, to enable Kroger to have a reliable supply of hand sanitizer and anti-bacterial soap to insure it could continue to supply these products to its shoppers.

21. No later than May 13, 2020, pursuant to this exchange of emails, K7 agreed to manufacture and sell and deliver to Kroger, and Kroger agreed to purchase from K7, hand sanitizer and anti-bacterial soap, at the following unit prices and quantities (collectively, the "Ordered Product"):

| Product | Number of Units | Price per Unit Delivered |
|---|---|---|
| 3 oz. bottles of hand sanitizer | 10,000,000 | $1.10 |
| 8 oz. bottles of hand sanitizer | 10,000,000 | $2.00 |
| 16 oz. bottles of hand sanitizer | 10,000,000 | $3.00 |
| 30 oz. bottles of hand sanitizer | 10,000,000 | $3.80 |
| 8 oz. bottles of anti-bacterial soap | 2,000,000 | $1.80 |
| | **Aggregate agreed contract price: $102,600,000** | |

22. Through this exchange of emails, which contained the material terms of the product order, the parties entered into a contract for the manufacture and sale by K7, and the purchase by Kroger, of the Ordered Product (the "Contract"). On May 8, 2020, Kroger Category Manager Blake Schmidt, the person at Kroger responsible for securing a supply of hand sanitizer and related products and the principal Kroger representative with whom K7 contracted, emailed Michael and one of his sons, two K7 principals, to say that Kroger was "[c]omitting to" the quantities and prices of the Ordered Product, as reproduced in the table above. Then, on May 11, 2020, Michael Kaplan emailed Schmidt, attaching "the shipping schedule for the commitments of Friday last week [referring to the May 8, 2020, email exchange]." Schmidt replied on May 13, 2020, writing, "I'm good with the shipping schedule. Anything we can do to pull quantities forward would be great."

23. Kroger not only wanted to buy $102,600,000 worth of sanitizer and soap; it wanted it fast. On May 8, 2020, Schmidt wrote: "I'm good with the 10m units of each. Thanks.

The next piece is how quickly can you get us large quantities?" Michael Kaplan responded "10m units confirmed – thank you. We will certainly produce as quickly as possible and [my son] will share updated shipping schedules with you."

24. Working with its overseas manufacturing partners, K7 immediately began producing to fill Kroger's order.

25. At this point, the relationship between K7 and Kroger was in good shape. In fact, in a telephone conversation on June 18, 2020, Schmidt told K7 that K7's hand sanitizer was one of Kroger's top-selling brands.

26. Moreover, Schmidt requested and received samples of K7's products at his home. In addition, as late as July 24, 2020, Schmidt requested (and received) from K7 forty 34-ounce containers of hand sanitizer for a Kroger vice president to donate to her daughter's school.

27. As noted above, the aggregate agreed contract price of the Ordered Product was $102,600,000.

28. In accordance with the Contract, and to meet its obligations to Kroger, K7 had all of the Ordered Product manufactured.

29. Meanwhile, upon beginning production of the Ordered Product, K7 shipped the product from the first production run agreed to in March 2020, to its warehouses in the United States. Due to a lack of space in Kroger warehouses and stores (a harbinger of the problems to come), K7 sold a portion of this first Kroger production run to other retailers with Kroger's encouragement and permission. The rest of the product was shipped to Kroger and paid for, totaling $4.8 million, essentially concluding the first production run by June 2020.

*Kroger's Stall and Delay*

30. Almost immediately after K7 began to ship the Ordered Product in July 2020, Kroger began falling behind on its commitment to accept deliveries. On July 10, 2020, Michael Kaplan emailed Schmidt to tell him that K7's warehouse director was "going postal" as orders for delivery from Kroger were behind by a week or more, a delay that, predictably, was disrupting K7's warehousing operations. Schmidt replied later that day, writing, "Finalizing now," in reference to the missing orders for delivery.

31. On July 31, 2020, Michael Kaplan informed Schmidt by email that, because Kroger had fallen significantly behind the agreed-to schedule for accepting periodic shipments of the Ordered Product, K7 would have to lease a third-party storage space for the backlogged Ordered Product and would thus "incur freight costs, storage fees by pallet and the like." Schmidt replied by email that same day, assuring Kaplan that K7 "should see PO's today for the sanitizer and the hand soap" and insisting, "Don't move the product to a third party as we cannot change the cost structure."

32. But the backlog just got worse.

33. Throughout August 2020, well after Kroger and K7 had agreed to the purchase and sale of $102,600,000 of product and K7 had produced it, Kroger, principally by Schmidt, through multiple emails and telephone and Zoom conversations, repeatedly confirmed that Kroger would accept the Ordered Product but stated that Kroger needed more time to take delivery because Kroger needed to open a new warehouse and arrange for sufficient storage capacity to accommodate what it had purchased.

34. In a telephone conversation on August 6, 2020, Schmidt confirmed to K7 that Kroger was going forward with the Ordered Products but that Kroger was working to "make space" for their orders from K7.

35. On September 3, 2020, Schmidt and Rebecca Calvin, a merchandising director for Kroger and higher ranking than Schmidt, told K7 that, after the Labor Day Weekend, Kroger would take delivery of sizeable amounts of the Ordered Product to relieve pressure in K7's warehouse.

36. Indeed, Calvin repeatedly confirmed to K7 in the September 3 conversation that Kroger remained "committed" to its replenishment of its original order from K7 via the Ordered Products.

37. Roughly four weeks later, on September 30, 2020, K7 spoke with Jordan Kremm, Kroger's vice president of health and beauty, who repeatedly acknowledged and re-affirmed Kroger's commitment and obligation to take delivery of the Ordered Product.

38. In this phone call, Kremm also assured K7 that Kroger promptly would resolve its storage capacity shortage so that it could take delivery of all remaining Ordered Product.

*Kroger Breached and Repudiated the Contract*

39. Despite Kroger's repeated assurances to K7, Kroger has accepted delivery of only a small part of the Ordered Product, the aggregate agreed price of which amounts to approximately $16.9 million.

40. Kroger has breached and repudiated the Contract by failing and refusing to accept the majority of the Ordered Product, the aggregate agreed price of which amounts to approximately $85.6 million (the "Unaccepted Product").

*K7 Has Been Gravely Damaged*

41. As a result of Kroger's breach and repudiation, K7 has been left with Unaccepted Product at an aggregate agreed price of $85.6 million for which K7 has incurred and paid, and continues to incur and pay, storage charges that mount each day and that already total in the hundreds of thousands of dollars.

42. Kroger has manifested no intention to accept delivery of, or to pay for, the Unaccepted Product, and despite its prior assurances to K7, Kroger has refused to respond to multiple urgent requests from K7 to take delivery of the Unaccepted Product.

*Kroger's Flimsy Excuses for its Non-Performance*

43. Instead of admitting it had ordered too much hand sanitizer and working cooperatively with K7 to come up with a solution, Kroger decided to make up "problems" and excuses in an effort to shift the blame for its own error.

44. In an attempt to cover for its breach and repudiation and further delay delivery and payment for the goods Kroger bought from K7, in a series of communications among the parties and their legal counsel in October and November 2020, Kroger, for the first time in the relationship between Kroger and K7, and despite having taken over $21 million worth of goods from K7 and resold them to its retail customers without incident, demanded a substantial and

wide-ranging array of information that is immaterial to the parties' respective contractual performance obligations.

45.     Kroger's extensive information requests were and are a mere pretext for its refusal to accept and pay for the Unaccepted Product.

46.     K7 responded to many of Kroger's barrage of requests and questions, including requests so palpably irrelevant and immaterial that they can be understood only as evidence of Kroger's intention to fabricate reasons for its intransigence and refusal to accept and pay for the Unaccepted Product.

47.     Despite K7's record of delivering specified product on time, as part of Kroger's effort to avoid its contractual obligation to accept and pay for the Unaccepted Product, Kroger requested, and K7 arranged, for Kroger to dispatch an inspector to the K7 warehouses in Los Angeles, California for the ostensible purpose of ensuring that K7 had actual possession of Unaccepted Product in the quantities that K7 had represented.

48.     In mid-October, 2020, Kroger's inspector visited the K7 warehouses in Los Angeles and confirmed that K7 did have actual possession of the Unaccepted Product in the quantities that K7 had represented—as K7 still does.

49.     Tellingly, during this extensive rigmarole, not a single representative of Kroger denied that Kroger had committed to accept and pay for the Unaccepted Product.

50.     Kroger's various post-breach information requests and pretextual, spurious, and baseless contentions and accusations, accompanied by Kroger's continued refusal to accept and pay for the Unaccepted Product, all further confirm that Kroger acknowledges that it entered into

the Contract and committed to pay for the Unaccepted Product. Otherwise, Kroger would perceive no need or reason to demand information that, if at all material and relevant, could have been used by Kroger only to try to wiggle out of its obligations. (The information Kroger sought – well after K7 produced the Unaccepted Product – are answers to the sorts of questions that retailers generally ask as part of *pre-contract* due diligence. Here, of course, based on its prior dealings with K7, Kroger had no need for due diligence – K7 had already proven itself to be a reliable supplier, including by previously producing on time the very same type of goods that comprise the Unaccepted Product.)

*K7 Is Entitled to Recover the Agreed Price of the Unaccepted Product*

51. Due to the worldwide COVID-19 pandemic and consequent widespread and accelerated ramp-up of production by suppliers to meet heightened demand for hand sanitizer and anti-bacterial soap, the market for the Unaccepted Product presently is saturated.

52. As a result of these market conditions, K7 has no channel through which to sell the Unaccepted Product to alternate buyers at anywhere close to the price Kroger agreed to pay at the height of the sanitizer shortage.

53. By reason of the foregoing, K7 is entitled to recover from Kroger the unpaid portion of the aggregate agreed price of the Unaccepted Product, in the amount of $85.6 million, plus the cost of storing Kroger's goods, pre-judgment interest, and other damages.

## COUNT II
### (In the Alternative, Promissory Estoppel)

54. K7 repeats each allegation pleaded in paragraphs 1 through 53 of this Complaint as if each such allegation had been pleaded here in full.

55. On May 13, 2020, Kroger communicated to K7 that Kroger would purchase from K7 40,000,000 units of hand sanitizer and 2,000,000 units of anti-bacterial soap (the "Product") during a period spanning from July 2020 through January 2021 (the "Purchase Commitment").

56. Kroger knew or reasonably should have known when it made the Purchase Commitment that K7 would manufacture the Product specifically for Kroger.

57. K7 reasonably relied on the Purchase Commitment.

58. In reliance on the Purchase Commitment, by August 2020, K7 had manufactured the entire quantity of Product necessary to fill the Purchase Commitment, including the millions of bottles, bottle caps, and labels necessary to unitize the Product for the consumer market, as Kroger had ordered.

59. In communications with K7 after making the Purchase Commitment, Kroger continued to express its expectation and desire to receive the Ordered Product.

60. Despite Kroger's Purchase Commitment and subsequent communications with K7, Kroger thereafter refused to accept the majority of the Product Order.

61. K7 relied to its detriment on Kroger's Purchase Commitment, in that K7 produced the Product specifically at Kroger's request and without an alternate purchaser.

62. By the time Kroger reneged on its Purchase Commitment, K7 had already manufactured all of the Product, including bottles, bottle caps, and labels.

63. Kroger has refused to take delivery of, or to pay for, Ordered Property in the amount of not less than $85.6 million.

64. As a result, K7 has been damaged in an amount not less than $85.6 million, plus the cost of storing Kroger's goods, pre-judgment interest, and other damages, which K7 will prove at trial.

65. Basic fairness and justice require that Kroger compensate K7 for the loss K7 incurred by relying on Kroger's broken promise.

WHEREFORE, the plaintiff demands judgment against the defendant as follows:

1. On Count I, in an amount to be determined, but not less than $85.6 million, plus the cost of storing Kroger's goods, and pre-judgment interest;

2. On Count II, in an amount to be determined, but not less than $85.6 million, plus the cost of storing Kroger's goods, and pre-judgment interest;

3. For the costs and disbursements of this action; and

4. For such other and further relief as the Court deems just and equitable under the circumstances.

Dated: December 2, 2020                                    Respectfully submitted,

/s/ *W.B. Markovits*
W.B. Markovits (0018514)
MARKOVITS, STOCK & DEMARCO, LLC
3825 Edwards Rd., Suite 650
Cincinnati, OH 45209
Telephone: (513) 651-3700
Fax: (513) 665-0219
Email: bmarkovits@msdlegal.com

/s/ *Paul M. Demarco*
Paul M. Demarco (0041153)
MARKOVITS, STOCK & DEMARCO, LLC
3825 Edwards Rd., Suite 650
Cincinnati, OH 45209
Telephone: (513) 651-3700
Fax: (513) 665-0219
Email: pdemarco@msdlegal.com

/s/ *Terence R. Coates*
Terence R. Coates (0085579)
MARKOVITS, STOCK & DEMARCO, LLC
3825 Edwards Rd., Suite 650
Cincinnati, OH 45209
Telephone: (513) 651-3700
Fax: (513) 665-0219
Email: tcoates@msdlegal.com

/s/ *Andrew E. Tomback*
Andrew E. Tomback
*Pro Hac Vice Forthcoming*
MCLAUGHLIN & STERN, LLP
260 Madison Ave
New York, NY 10016
Telephone: (212) 448-1100
Fax: (212) 448-0066
Email: atomback@mclaughlinstern.com

/s/ *Daniel J. Horwitz*
Daniel J. Horwitz
*Pro Hac Vice Forthcoming*
MCLAUGHLIN & STERN, LLP
260 Madison Ave
New York, NY 10016
Telephone: (212) 448-1100
Fax: (212) 448-0066
Email: dhorwitz@mclaughlinstern.com

/s/ *Andrew J. Luskin*
Andrew J. Luskin
*Pro Hac Vice Forthcoming*
MCLAUGHLIN & STERN, LLP
1122 Franklin Ave
Garden City, NY 11530
Telephone: (516) 829-6900
Fax: (516) 829-6966
Email: aluskin@mclaughlinstern.com