IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| K7 DESIGN GROUP, INC., | ) | Case No. 1:20-cv-00975 |
| | ) | |
| Plaintiff, | ) | Judge: Michael R. Barrett |
| | ) | |
| v. | ) | |
| | ) | AMENDED COMPLAINT |
| THE KROGER CO., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, K7 Design Group, Inc. ("K7" and "Plaintiff"), by and through its attorneys, brings this Amended Complaint against The Kroger Co. ("Kroger" and "Defendant"), and alleges and states as follows:

Introduction and Nature of the Action

1. This action arises from an enormous miscalculation by the defendant, Kroger, the nation's largest grocery chain, which grossly over-ordered over $100 million worth of hand sanitizer and anti-bacterial soap in the midst of a worldwide pandemic, from the plaintiff, K7, a family-owned business. Kroger made its huge orders to take advantage of a worldwide spike in demand for hand sanitizer and similar products. But Kroger ordered too much – way too much. The reason was simple – Kroger and other retailers made massive orders; as a result, the supply of hand sanitizer and similar products grew rapidly and tremendously. Demand did not keep pace. Rather than accept responsibility for its misjudgment, Kroger has tried to shift it to (at least) one of its suppliers – K7.

{N0290977.4}

2. Once Kroger realized that it had over-ordered and did not even have adequate storage space to accept what it had ordered, Kroger refused to pay for or to accept delivery of the vast majority of the hand sanitizer that K7 had manufactured for Kroger.

3. Because Kroger reneged, K7 has been left with a huge quantity of hand sanitizer for which K7 has no other use. And, after it had refused to take delivery, Kroger tried to use its immense market power to force K7 to absorb losses that, both in equity and because of K7's and Kroger's contract, should be borne by Kroger.

4. In late 2019 and early 2020, the Novel Coronavirus (COVID-19) quickly spread around the globe, ravaged millions, and imposed enormous demands on health systems. COVID-19 led people to take extraordinary precautions to avoid infection and spread.

5. Before the COVID-19 pandemic, hand sanitizer, a common consumer product, was plentiful in retail establishments and widely available for purchase. Supply and demand were in sync. With the onset of the pandemic, public health authorities advised people to avoid contracting the virus, believed to spread both through airborne transmission and through contact with commonly used surfaces (like gas pump handles and elevator buttons), by frequently washing or sanitizing their hands (among other precautions). Hand sanitizer quickly flew off of store shelves and became largely unavailable by the spring of 2020. Supply and demand were suddenly very much out of sync. See, e.g., Julie Creswell, "Where Do I find Your Hand Sanitizer?" Sorry, We Have None., N.Y. Times (Feb. 29, 2020), https://nyti.ms/2TDcqjp.

6. Against this backdrop, defendant Kroger, the largest grocery chain in the United States, with more than 2,700 grocery retail stores operating under a variety of banner names, moved quickly to fill their customers' and consumers' dire need for hand sanitizer and related products. To capture supply, Kroger placed orders with a wide array of suppliers and manufacturers.

7. Kroger asked K7, a previously approved Kroger vendor, among other suppliers, to produce large quantities of hand sanitizer and anti-bacterial soap for Kroger so that Kroger could provide them to its customers throughout the United States.

8. *K7* is a New York-based, family-owned manufacturer and distributor of consumer products sold under the "Ultra Defense" brand label. K7 is managed by Michael Kaplan and his four sons. K7 has spent three decades in the health and wellness space, producing private-label and branded products, in both food and drug, for many of the nation's largest retailers, including Kroger, as well as for warehouse clubs and smaller local establishments. By March 2020, K7 had begun producing hand sanitizer and related sanitizing products.

9. K7 had previously sold cosmetics to Kroger in or around 2017 in a deal that representatives from K7 struck after meeting representatives from Kroger at an industry trade show. The transaction was successful for both parties and was completed without a hitch.

10. As described below, in the spring of 2020, Kroger committed to purchase more hand sanitizer and related anti-bacterial products than it could store and warehouse, and then proceeded to shift to K7 the economic burdens that flowed from Kroger's misjudgment

of its ability to absorb the goods it ordered into either Kroger's retail stores, storage facilities, or its supply chain.

11. As a result, Kroger breached and repudiated its purchase commitments, leaving K7 with damages of not less than $66 million.

12. K7 has suffered additional damages because Kroger's breach and repudiation of its purchase commitments has caused K7 to incur hundreds of thousands of dollars of storage fees for the quantities of product that it manufactured specifically to fulfill Kroger's orders. K7 has put Kroger on notice on multiple occasions that its refusal to take delivery of various shipments of the hand sanitizer and anti-bacterial soap was adding to K7's losses. Nevertheless, Kroger has continued unjustifiably to refuse to take delivery of the product by withholding delivery instructions. In so doing, Kroger has breached and repudiated its contractual commitment to accept and pay for the manufactured goods identified to Kroger's purchase commitments.

## Jurisdiction and Venue

13. The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(1).

14. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), as defendant Kroger resides in this district.

## The Parties

15. K7 is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.

16. Kroger is a corporation organized under the laws of Ohio with its principal place of business in Cincinnati, Ohio.

## COUNT I
(Breach of Contract)

17. Since late 2017, when it supplied cosmetics to Kroger, K7 has been an approved vendor of Kroger.

18. In early March 2020, Kroger started rationing hand sanitizer because its supply of this critical product could not keep up with the exploding demand due to COVID-19. *See* John Matarese, Kroger Puts Limits on Sanitizer and Wipe Purchases: Pharmacists Beg People to Stop Hoarding, ABC Cincinnati (Mar. 3, 2020), https://tinyurl.com/y5ys6u8a. Soon after, Kroger CEO Rodney McMullen addressed the shortage of hand sanitizer and other similar products by posting a video on Kroger's social media that assured shoppers Kroger was working hard to get "the supplies and products [their] customers need[ed] most," that the store's supply chain was working "tirelessly around the clock" to replenish critical supplies, and that shoppers could "purchase what [they] need[ed] knowing [Kroger would] continue to replenish" these supplies. @krogerco, Instagram (Mar. 17, 2020), https://www.instagram.com/p/B911-hjnriK/. However, Kroger was still running short on hand sanitizer a month later when McMullen appeared on Good Morning America and reported: "I was in the store last night — we had toilet paper, plenty of meat variety products: beef, pork, chicken, all those things . . . . As for hand sanitizer, I think it is going to take a little bit longer." Stephanie Wash et al., Grocery Stores See Food Supplies

<u>Stabilizing, but Don't Expect Hand Sanitizer Anytime Soon</u>, ABC News (Apr. 22, 2020), https://tinyurl.com/y55vchg2.

19. In late March 2020, in response to the global COVID-19 pandemic, K7 offered to sell a large quantity of hand sanitizer to Kroger on an expedited basis. The two companies struck a deal for the sale of several million units of hand sanitizer, to be shipped as quickly as possible. This production run and ensuing shipment essentially concluded in June 2020 without complaint from Kroger.

*The May 2020 Contract*

20. In an exchange of emails between Kroger and K7, between approximately May 5, 2020, and May 13, 2020, K7 and Kroger discussed a second "replenishment" production run of hand sanitizer and anti-bacterial soap that K7 would manufacture and sell to Kroger by making deliveries, according to a prescribed schedule running from mid-July 2020, to January 2021, to enable Kroger to have a reliable supply of hand sanitizer and anti-bacterial soap to insure it could continue to supply these products to its shoppers.

21. No later than May 13, 2020, pursuant to this exchange of emails, K7 agreed to manufacture and sell and deliver to Kroger, and Kroger agreed to purchase from K7, hand sanitizer and anti-bacterial soap, at the following unit prices and quantities (collectively, the "Ordered Product"):

| Product | Number of Units | Price per Unit Delivered |
|---|---|---|
| 3 oz. bottles of hand sanitizer | 10,000,000 | $1.10 |
| 8 oz. bottles of hand sanitizer | 10,000,000 | $2.00 |
| 16 oz. bottles of hand sanitizer | 10,000,000 | $3.00 |
| 30 oz. bottles of hand sanitizer | 10,000,000 | $3.80 |
| 8 oz. bottles of anti-bacterial soap | 2,000,000 | $1.80 |
| | | **Aggregate agreed contract price: $102,600,000** |

22. Through this exchange of emails, which contained the material terms of the product order, the parties entered into a contract for the manufacture and sale by K7, and the purchase by Kroger, of the Ordered Product (the "Contract"). On May 8, 2020, Kroger Category Manager Blake Schmidt, the person at Kroger responsible for securing a supply of hand sanitizer and related products and the principal Kroger representative with whom K7 contracted, emailed Michael Kaplan and one of his sons, two K7 principals, to say that Kroger was "[c]ommitting to" the quantities and prices of the Ordered Product, as reproduced in the table above. Then, on May 11, 2020, Michael Kaplan emailed Schmidt, attaching "the shipping schedule for the commitments of Friday last week [referring to the May 8, 2020, email exchange]." Schmidt replied on May 13, 2020, writing, "I'm good with the shipping schedule. Anything we can do to pull quantities forward would be great."

23. Kroger not only wanted to buy $102,600,000 worth of sanitizer and soap; it wanted it fast. On May 8, 2020, Schmidt wrote: "I'm good with the 10m units of each. Thanks. The next piece is how quickly can you get us large quantities?" Michael Kaplan

responded "10m units confirmed – thank you.  We will certainly produce as quickly as possible and [my son] will share updated shipping schedules with you."

24. Working with its overseas manufacturing partners, K7 immediately began producing to fill Kroger's order.

25. At this point, the relationship between K7 and Kroger was in good shape.  In fact, in a telephone conversation on June 18, 2020, Schmidt told K7 that K7's hand sanitizer was one of Kroger's top-selling brands.

26. Moreover, Schmidt requested and received samples of K7's products at his home.  In addition, as late as July 24, 2020, Schmidt requested (and received) from K7 forty 34-ounce containers of hand sanitizer for Kroger Vice President Jordan Kremm to donate to her daughter's school.

27. As noted above, the aggregate agreed contract price of the Ordered Product was $102,600,000.

28. In accordance with the Contract, and to timely meet its obligations to Kroger, during the period from approximately March 2020 through May 2020, K7 placed orders with its affiliate factories in China to produce all of the Ordered Product.

29. Meanwhile, upon beginning production of the Ordered Product, K7 shipped the product from the first production run agreed to in March 2020, to its warehouses in the United States.  Due to a lack of space in Kroger warehouses and stores, K7 sold a portion of this first Kroger production run to other retailers with Kroger's encouragement and

permission. The rest of the product was shipped to Kroger and paid for, totaling $4.8 million, essentially concluding the first production run by June 2020.

*Kroger's Stall and Delay*

30. Almost immediately after K7 began to ship the Ordered Product in July 2020, Kroger began falling behind on its commitment to accept deliveries of the Ordered Product. On July 10, 2020, Michael Kaplan emailed Schmidt to tell him that K7's warehouse director was "going postal" as orders for delivery from Kroger were behind by a week or more, a delay that, predictably, was disrupting K7's warehousing operations. Schmidt replied later that day, writing, "Finalizing now," in reference to the missing orders for delivery.

31. On July 31, 2020, Michael Kaplan informed Schmidt by email that, because Kroger had fallen significantly behind the agreed-to schedule for accepting periodic shipments of the Ordered Product, K7 would have to lease a third-party storage space for Ordered Product that was ready to be delivered to Kroger. K7 thus would "incur freight costs, storage fees by pallet and the like." Schmidt replied by email that same day, assuring Kaplan that K7 "should see PO's today for the sanitizer and the hand soap" and insisting, "Don't move the product to a third party as we cannot change the cost structure."

32. Throughout August 2020, well after Kroger and K7 had agreed to the purchase of the Ordered Product, at an aggregate price of $102,600,000, Kroger, principally by Schmidt, through multiple emails and telephone and Zoom conversations, repeatedly confirmed that Kroger would accept the Ordered Product, but stated that Kroger needed more

time to take delivery because Kroger needed to open a new warehouse and arrange for sufficient storage capacity to accommodate all of the Ordered Product.

33. In a telephone conversation on August 6, 2020, Schmidt confirmed to K7 that Kroger was going forward with the Ordered Product, but that Kroger was working to "make space" for their orders from K7.

34. On September 3, 2020, Schmidt and Rebecca Calvin, a merchandising director for Kroger and higher ranking than Schmidt, told K7 that, after the Labor Day Weekend, Kroger would take delivery of sizeable amounts of the Ordered Product to relieve pressure in K7's warehouse.

35. Indeed, Calvin repeatedly confirmed to K7 in the September 3 conversation that Kroger remained "committed" to its replenishment of its original order from K7, namely the Ordered Product.

36. Roughly four weeks later, on September 30, 2020, K7 spoke with Jordan Kremm, Kroger's vice president of health and beauty, who repeatedly acknowledged and re-affirmed Kroger's commitment and obligation to take delivery of all units of goods that comprised the Ordered Product.

37. In this phone call, Kremm also assured K7 that Kroger promptly would resolve its storage capacity shortage so that it could take delivery of all remaining Ordered Product.

*Kroger Breached and Repudiated the Contract*

38. Despite its repeated assurances to K7, Kroger has breached and repudiated the Contract by failing and refusing to accept a portion of the Ordered Product that K7 actually produced, having an aggregate agreed price of $41,475,889.60 (the "Unaccepted Produced Product").

39. The Unaccepted Produced Product was identified to the Ordered Product.

40. After managing to sell some of the Unaccepted Produced Product to alternate buyers, K7 was left with Unaccepted Produced Product having an aggregate agreed price of not less than $35 million (the "Mitigated Produced Product Damages").

41. K7 has been unable to sell any additional units of the Unaccepted Produced Product due to the worldwide COVID-19 pandemic and consequent widespread and accelerated ramp-up of production by suppliers to meet heightened demand for hand sanitizer and anti-bacterial soap and the resulting saturation of the market for the Unaccepted Produced Product.

42. As a result of Kroger's breach and repudiation, on or about August 4, 2020, K7 ceased production of the portion of the Ordered Product that had not yet been produced and that had an aggregate agreed price of not less than $44 million (the "Unproduced Ordered Product").

43. K7 has sustained damages of not less $31 million in respect of the Unproduced Ordered Product, to which Kroger had committed and to which K7 had committed its production resources.

*Kroger's Pretextual Excuses for its Non-Performance*

44. Instead of admitting that it had ordered too much hand sanitizer and anti-bacterial soap, and working cooperatively with K7 to come up with a solution, Kroger decided to make up "problems" and excuses in an effort to shift the blame for its own error.

45. In an attempt to excuse its breach and repudiation and further delay delivery and payment for all of the Ordered Product, in a series of communications among the parties and their legal counsel in October and November 2020, Kroger, for the first time in its relationship with K7, and despite having taken over $21 million worth of goods from K7 and resold them to its retail customers without any reported incident, demanded a substantial and wide-ranging array of information that is immaterial to the parties' respective contractual performance obligations.

46. Kroger's extensive information requests were and are a mere pretext for its refusal to accept and pay for all of the Ordered Product.

47. K7 responded to many of Kroger's barrage of requests and questions, including requests so palpably irrelevant and immaterial that they can be understood only as evidence of Kroger's intention to fabricate reasons for its intransigence and refusal to accept and pay for all the Ordered Product.

48. Despite K7's record of delivering specified product on time, as part of Kroger's effort to avoid its contractual obligation to accept and pay for all the Ordered Product, Kroger requested, and K7 arranged, for Kroger to dispatch an inspector to the K7 warehouses in Los Angeles, California for the ostensible purpose of ensuring that K7 had actual possession of Unaccepted Produced Product in the quantities that K7 had represented.

49. In mid-October 2020, Kroger's inspector visited the K7 warehouses in Los Angeles and confirmed that K7 did have actual possession of the Unaccepted Produced Product in the quantities that K7 had represented.

50. Tellingly, during this extensive rigmarole, not a single representative of Kroger denied that Kroger had committed to accept and pay for the Unaccepted Produced Product.

51. Kroger's various post-breach information requests and pretextual, spurious, and baseless contentions and accusations, accompanied by Kroger's continued refusal to accept and pay for the Unaccepted Produced Product, all further confirm that Kroger acknowledges that it entered into the Contract and committed to pay for the full amount of the Ordered Product. Otherwise, Kroger would have perceived no need or reason to demand information that, if at all material and relevant, could have been used by Kroger only to try to wiggle out of its obligations. (The information Kroger sought – well after K7 produced the Unaccepted Produced Product – are answers to the sorts of questions that retailers generally ask as part of *pre-contract* due diligence. Here, of course, based on its prior dealings with K7, Kroger had no need for due diligence – K7 had already proven itself to be a reliable

supplier, including by previously producing on time the very same type of goods that comprise the Ordered Product.)

52. As a result of the foregoing, K7 has sustained damages of, and is entitled to recover from Kroger not less than $66 million, plus the cost of storing the Unaccepted Produced Product, pre-judgment interest, and other damages that K7 will prove.

## COUNT II
(**In the Alternative,** Promissory Estoppel)

53. K7 repeats each allegation pleaded in paragraphs 1 through 52 of this Amended Complaint as if each such allegation had been pleaded here in full.

54. On May 13, 2020, Kroger communicated to K7 that Kroger would purchase from K7, and it ordered from K7 and committed to the purchase of, 40,000,000 units of hand sanitizer and 2,000,000 units of anti-bacterial soap (the "Ordered Product"), for delivery during a period spanning from July 2020 through January 2021, all at agreed prices (the "Purchase Commitment").

55. Kroger knew or reasonably should have known when it made the Purchase Commitment that K7 would manufacture the Product specifically for Kroger.

56. K7 reasonably relied on the Purchase Commitment.

57. After making the Purchase Commitment, Kroger continued to communicate to K7 Kroger's expectation and desire to receive the Ordered Product.

58. In reliance on Kroger's Purchase Commitment, and subsequent communications in which Kroger reconfirmed its Purchase Commitment, K7 devoted available production facilities and resources to produce the Ordered Product specifically to satisfy Kroger's Purchase Commitment.

59. In reliance on Kroger's Purchase Commitment, by August 2020, a portion of the Product having an aggregate agreed price of more than $58 million had been manufactured at the direction of K7.

60. Despite Kroger's Purchase Commitment and subsequent confirming communications with K7, Kroger refused to accept a portion of the Ordered Product that K7 had produced, having an aggregate agreed price of not less than $41 million (the "Unaccepted Produced Product").

61. When Kroger reneged on its Purchase Commitment, K7 took steps to mitigate its losses, including selling a portion of the Unaccepted Produced Product to alternate buyers to the extent commercially feasible, and ceasing production of additional units of Ordered Product.

62. After selling a portion of the Unaccepted Produced Product to alternate purchasers, K7 was left with a portion of Unaccepted Produced Product having an aggregate agreed price and value of not less than $35 million (the "Mitigated Produced Product Damages").

63. In addition to its Mitigated Produced Product Damages, when Kroger reneged on its Purchase Commitment, K7 sustained additional damages of not less than $31 million attributable to the portion of the Ordered Product that K7 had not yet been produced.

64. As a result, K7 has been damaged in an amount not less than $66 million in detrimental reliance on Kroger's Purchase Commitment.

65. On the basis of the foregoing, basic fairness and justice require that K7 recover judgment against Kroger in an amount not less than $66 million, together with the cost of storing the Unaccepted Produced Product.

WHEREFORE, the plaintiff demands judgment against the defendant as follows:

1. On Count I, in an amount to be determined, but not less than $66 million, plus the cost of storing the Unaccepted Produced Product, and pre-judgment interest;

2. On Count II, in an amount to be determined, but not less than $66 million, plus the cost of storing the Unaccepted Produced Product, and pre-judgment interest;

3. For the costs and disbursements of this action; and

4. For such other and further relief as the Court deems just and equitable under the circumstances.

Dated: April 7, 2021

Respectfully submitted,

/s/ *W.B. Markovits*
W.B. Markovits (0018514)
MARKOVITS, STOCK & DEMARCO, LLC
3825 Edwards Rd., Suite 650
Cincinnati, OH 45209
Telephone: (513) 651-3700
Fax: (513) 665-0219
Email: bmarkovits@msdlegal.com

/s/ *Paul M. Demarco*
Paul M. Demarco (0041153)
MARKOVITS, STOCK & DEMARCO, LLC
3825 Edwards Rd., Suite 650
Cincinnati, OH 45209
Telephone: (513) 651-3700
Fax: (513) 665-0219
Email: pdemarco@msdlegal.com

/s/ *Terence R. Coates*
Terence R. Coates (0085579)
MARKOVITS, STOCK & DEMARCO, LLC
3825 Edwards Rd., Suite 650
Cincinnati, OH 45209
Telephone: (513) 651-3700
Fax: (513) 665-0219
Email: tcoates@msdlegal.com

/s/ *Andrew E. Tomback*
Andrew E. Tomback
*Pro Hac Vice*
MCLAUGHLIN & STERN, LLP
260 Madison Ave
New York, NY 10016
Telephone: (212) 448-1100
Fax: (212) 448-0066
Email: atomback@mclaughlinstern.com

/ *Daniel J. Horwitz*
Daniel J. Horwitz
*Pro Hac Vice*
MCLAUGHLIN & STERN, LLP
260 Madison Ave
New York, NY 10016
Telephone: (212) 448-1100
Fax: (212) 448-0066
Email: dhorwitz@mclaughlinstern.com

/s/ *Andrew J. Luskin*
Andrew J. Luskin
*Pro Hac Vice*
MCLAUGHLIN & STERN, LLP
1122 Franklin Ave
Garden City, NY 11530
Telephone: (516) 829-6900
Fax: (516) 829-6966
Email: aluskin@mclaughlinstern.com